SEALED

# United States District Court

__NORTHERN__ DISTRICT OF __TEXAS__

FILED
NOV 26 2014
CLERK, U.S. DISTRICT COURT
By _____
Deputy

UNITED STATES OF AMERICA

V.

ALEJANDRO BARAJAS TORRES

**COMPLAINT**

CASE NUMBER: 3-14-MJ- 804 BK

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. On or about November 24, 2014, in the Dallas Division of the Northern District of Texas, defendant, Alejandro Barajas Torres did,

> conspire to possess with the intent to distribute five hundred (500) grams or more of a mixture or substance containing a detectable amount of methamphetamine, a Schedule II controlled substance; and did possess with the intent to distribute five hundred (500) grams or more of a mixture or substance containing a detectable amount of methamphetamine, a Schedule II controlled substance,

in violation of Title 21, United States Code, Section(s) 846 and 841(a)(1) and (b)(1)(A).

I further state that I am a Special Agent with Homeland Security Investigations (HSI) and that this complaint is based on the following facts:

> See attached Affidavit of Special Agent's Steven Royer which is incorporated and made a part hereof by reference.

Continued on the attached sheet and made a part hereof:   XX Yes   No

_____
Signature of Complainant
Steven Royer
Special Agent, HSI

Sworn to before me and subscribed in my presence, on this 26th day of November 2014, in Dallas, Texas.

RENEE H. TOLIVER
UNITED STATES MAGISTRATE JUDGE
Name and Title of Judicial Officer

_____
Signature of Judicial Officer

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Steven Royer, a Special Agent with Homeland Security Investigations, being duly sworn, depose and states:

1. I am a Special Agent (SA) of the United States Department of Homeland Security, Homeland Security Investigations (HSI) Special Agent in Charge Dallas, Texas, and have been so employed since March 2004. Prior to my employment with HSI, I was employed as an officer with the United States Customs and Border Protection (CBP) for over five years. I am currently assigned to the Texas Oklahoma High Intensity Drug Trafficking Area (TEXHOMA HIDTA), which investigates narcotics smuggling as well as money laundering. In connection with my official duties, I investigate criminal violations of the Controlled Substances Act and money laundering statutes of Title 21 and Title 18, United States Code. I have used a variety of methods during these investigations, including, but not limited to, visual surveillance, general questioning of witnesses, the use of search warrants, confidential informants, undercover agents, and pen registers. The source of my information and the grounds for my beliefs are as follows:

2. I am an "investigative or law enforcement officer of the United States" within the meaning of 18 U.S.C. § 2510(7); that is, I am an officer of the United States who is authorized by law to conduct investigations and make arrests for offenses enumerated in 18 U.S.C. § 2516.

3. Because this affidavit is offered for the limited purposes of supporting a criminal complaint charging **Alejandro BARAJAS TORRES** with a violation of 21

U.S.C. §§ 841(a)(1)&(b)(1)(A), that is possession with intent to distribute five hundred (500) grams or more of a mixture or substance containing a detectable amount of methamphetamine, a Schedule II controlled substance; and 21 U.S.C. § 846, that is conspiracy to possess with intent to distribute five hundred (500) grams or more of a mixture or substance containing a detectable amount of methamphetamine, a Schedule II controlled substance, it does not include all facts known to me regarding this investigation.

### **PROBABLE CAUSE**

4. On November 20, 2014, I was contacted regarding the two (2) United Parcel Service (UPS) mail parcels boxes that arrived at the World Trade Bridge Cargo facility in Laredo, Texas from Mexico.

5. The two (2) packages were sent for inspection and both contained mini-split air conditioners. Both mail parcel boxes were taken to the high energy x-ray (Intellix) by Custom and Border Protection (CBP) certified operators, where a scan revealed anomalies within the compressors of the air conditioners.

6. I am aware that prior to any international merchandise, including personal effects, entering the commerce of the United States, CBP personnel subject such merchandise to inspection. This inspection is conducted in accordance with the authority granted to the former United States Customs Service under the provisions of Title 19 United States Code Section 1581.

7. A CBP trained narcotics dog conducted a positive alert on both of the parcel boxes. CBP officers opened one of the parcel boxes that contained one (1) mini

split air conditioner. Upon further inspection, CBP officers noticed that the unit appeared to be taken apart and reassembled using multiple types of screws.

8. CBP officers drilled into the air conditioner compressor where the scan revealed anomalies and a white powdery substance was discovered. The substance was field tested and it tested positive for methamphetamine, a Schedule II Controlled Substance.

9. CBP officers re-assembled and repackaged the mini-split air conditioner for a controlled delivery. Both UPS mail parcel boxes were secured in the evidence vault pending delivery to Dallas, Texas for a controlled delivery.

10. On November 21, 2014, the parcel boxes were transported by Laredo HSI agents to the Austin HSI office where Dallas HSI SA Kory Casler took possession of the parcel boxes and transported them to the HSI Dallas office located at 125 E. John Carpenter Freeway Suite 800, Irving, Texas 75062. The parcel boxes were secured in the evidence vault pending a controlled delivery.

11. On November 24, 2014, at approximately 2:23 p.m., a law enforcement Task Force Officer (TFO), acting in an undercover capacity ("UC") as a UPS Postal Service employee attempted to deliver both UPS parcel boxes to 1916 Sandcastle Trail, Mesquite, Texas 75149. No one was present at delivery, and the packages were left at front of the door.

12. At approximately 5:55 p.m., law enforcement surveillance units observed a red Dodge Durango bearing Texas license plate CD1Y546 drive to the front of the residence and parked on Sandcastle Trail in front of 1916. A male driver, later identified

as Edgar Aguirre ("EDGAR") and a male passenger, later identified as Armando Aguirre ("ARMANDO") exited the vehicle and walked to the front of the residence. Both individuals entered the residence through the front door.

13. At approximately 5:56 p.m., law enforcement surveillance units observed EDGAR and ARMANDO take the two packages, containing the air conditioners and the methamphetamine, inside the residence and close the front door. EDGAR and ARMANDO were observed standing in the front area of the residence and appeared to be looking around waiting for someone. EDGAR and ARMANDO were observed by law enforcement surveillance going in and out of the residence multiple times as well as looking out the front windows.

14. At approximately 6:17 p.m., an orange Dodge truck bearing Texas license plate BD36541 drove to the front of the residence and parked in front of the red Dodge Durango on Sandcastle Trail in front of 1916. A male subject came out of the residence and walked up to the passenger side of the orange Dodge truck. Approximately a minute later both male individuals walked back to the residence and both went inside and shut the front door. The driver of the orange Dodge truck was later identified as **Alejandro BARAJAS TORRES ("ALEJANDRO")**.

15. At approximately 6:45 p.m., EDGAR, ARMANDO, and **ALEJANDRO** exited the residence through the front door and walked towards the vehicles parked at the front of the residence. **ALEJANDRO** got back into his orange Dodge truck and EDGAR and ARMANDO got back into the red Dodge Durango. Both vehicles departed the residence and were subsequently traffic stopped shortly thereafter.

16. EDGAR, ARMANDO, and **ALEJANDRO** were brought back to the residence for further interviews. EDGAR was identified as the owner of the residence and gave verbal consent to law enforcement agents and officers to enter the residence and conduct a search.

17. Law Enforcement agents and officers conducted a security sweep and search of the inside and outside of the residence. The two (2) unopened UPS packages were discovered in an upstairs bedroom closet.

18. At approximately 7:15 p.m., EDGAR gave verbal consent to talk with HSI SA Steven Royer and HSI SA Derek Hubert. The Agents explained to EDGAR that at this time he was not under arrest.

19. During the interview, EDGAR stated that he met **ALEJANDRO** approximately six to seven months ago playing pool in Dallas. Approximately a week ago, **ALEJANDRO** asked EDGAR for a "favor" and **ALEJANDRO** asked EDGAR to allow a few packages be delivered to EDGAR's residence located at 1916 Sandcastle Trail, Mesquite, Texas.

20. EDGAR agreed and was instructed by **ALEJANDRO** to call **ALEJANDRO** and let him know when the packages arrived at the residence. EDGAR claimed that he did not know what was being shipped to his residence, and EDGAR was never told that he would receive any compensation for doing the "favor."

21. When **ALEJANDRO** arrived at the residence, **ALEJANDRO** visually inspected the packages that were located near the front door and then the packages were

moved to the upstairs bedroom closet. **ALEJANDRO** instructed **EDGAR** to hold on to the packages and that **ALEJANDRO** was going to go to Houston, Texas tomorrow.

22. At approximately 8:10 p.m., HSI SA Steven Royer, SA Derek Hubert and TFO Victor Rodriguez (Spanish translation) asked **ALEJANDRO** if he would like to talk to law enforcement. The Agents explained to **ALEJANDRO** that at this time he was not under arrest.

23. **ALEJANDRO** gave verbal consent and was given a DHS *Miranda* warnings form in the Spanish language. **ALEJANDRO** read and signed the *Miranda* form and was asked TFO Rodriguez if he understood his rights. **ALEJANDRO** stated that he understood his *Miranda* rights and still wished to talk to law enforcement.

24. According to **ALEJANDRO**, in approximately July 2013, **ALEJANDRO** received a call from a friend known as "Arturo" ("**ARTURO**") who wanted to know if **ALEJANDRO** wanted to make money picking up money and sending money south to Mexico. **ALEJANDRO** agreed and started picking up bulk cash drug proceeds for an individual known as "Guerrero" ("**GUERRERO**") who was in Mexico.

25. **ALEJANDRO** stated that he would pick up a minimum of $10,000 to $15,000 (USD) every week at the direction of GUERRERO from different individuals.

26. **ALEJANDRO** would then meet and give the money to other individuals or send money south to Mexico via Money Gram or Western Union. **ALEJANDRO** was paid $500 to $1000 (USD) to complete the money transactions. **ALEJANDRO** stated that the last money pickup for GUERRERO was done approximately two or three (2 or 3) days ago.

27. Approximately $11,980 (USD) was seized from **ALEJANDRO**'s vehicle and person. **ALEJANDO** stated that the money in his vehicle was from the last money pick up.

28. In or about August 2013, **ALEJANDRO** was instructed by GUERRERO to find locations to start receiving packages from Mexico. **ALEJANDRO** stated that the packages contained crystal methamphetamine known as "ice" or "yellow" that were concealed inside of cargo, usually air conditioner units.

29. **ALEJANDRO** stated that he knew that methamphetamine was inside the packages because GUERRERO told him. GUERRERO would provide the name on the package and would check on the delivery status. **ALEJANDRO** would pick the location for shipment and provide the address to GUERRERO. **ALEJANDRO** was paid $1,000 (USD) to receive the methamphetamine packages, but also stated that GUERRERO would pay $1,000 (USD) to the individuals who houses were used.

30. After the arrival of a shipment of methamphetamine laden packages, **ALEJANDRO** would usually receive a text or call from GUERRERO to confirm the arrival. Later that day or the next day, **ALEJANDRO** would receive a call from unknown individuals who would arrange to pick the packages up and take to an unknown location.

31. From August 2013 to present, **ALEJANDRO** has received approximately five (5) shipments containing methamphetamine. Each shipment usually consisted of two to three (2-3) boxes.

32. Agents measured and weighed the substance in the air conditioning units and determined that, it weighed approximately 16.75 kilograms (16,750 grams). A subsequent field test analysis of the substance returned positive for the presence of methamphetamine, a Schedule II controlled substance.

[remainder of page left intentionally blank]

## CONCLUSION

33. Based on the foregoing facts, probable cause exists to believe that **Alejandro BARAJAS TORRES** did knowingly, intentionally and unlawfully combine, conspire, confederate, and agree together with persons both known and unknown to commit the following offense against the United States: to possess with intent to distribute five kilograms or more of a mixture or substance containing a detectable amount of methamphetamine, a Schedule II controlled substance, in violation of 21 U.S.C. §§ 841 (a)(1)&(b)(1)(A) and 21 U.S.C § 846.

_____
Steven Royer
Special Agent-HSI

Subscribed and sworn to before me on this the ____ day of November, 2014.

_____
HON. RENEE HARRIS TOLIVER
UNITED STATES MAGISTRATE JUDGE
NORTHERN DISTRICT OF TEXAS